UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NICOLE HOOK, et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>CITY OF REDDING, et al.,<br><br>    Defendants. | No. 2:20-cv-02365-MCE-DMC<br><br>**MEMORANDUM AND ORDER** |

Plaintiffs Nicole Hook ("Nicole") and Jonson Tyler Hook ("Tyler") (collectively, "Plaintiffs")[1] initiated this action against Defendants the City of Redding (the "City"), Redding Police Chief Roger Moore ("Chief Moore"), Officers Nolan Guiducci, Kurtis Stenderup, Jeffrey Schmidt, Travis Braud, Jamie Rouland, and Shannah Johnson for constitutional violations arising out Plaintiffs' arrest for being intoxicated in public and resisting arrest. Presently before the Court is Defendants' Motion for Summary Judgment.[2] ECF No. 35. For the following reasons, that Motion is GRANTED.

---

[1] Given that Plaintiffs share a surname, the Court will refer to them by the names used in their Opposition going forward.

[2] Because oral argument would not have been of material assistance, the Court ordered this matter submitted on the briefs. E.D. Local Rule 230(g).

1

# BACKGROUND[3]

In the late evening of November 3, 2018, Rebecca Savard was working as the security supervisor at the Win-River Casino in Redding, California. She received a call for a "verbal," which is code for "verbal altercation" occurring first in the casino and moving to the valet area. Video surveillance shows that Tyler was belligerent as he navigated the casino floor toward the valet area, arguing with individuals and throwing his hat aggressively. When he reached the casino's valet area, Tyler was still visibly irate, arguing with security guards, and yelling at Nicole. According to Savard, Tyler was also threatening to fight security staff and shouting obscenities.[4]

Guiducci was on routine patrol in a marked Redding police car in full uniform that night when he was approached by a casino security guard regarding an intoxicated man refusing to leave the property.[5] While at the southern eastern side of the Casino, Guiducci observed Tyler yelling at security guards. Guiducci observed Tyler's demeanor as being agitated, with him throwing his hands up and gesturing. Guiducci engaged in a conversation with Tyler during which Tyler told Guiducci that he was having "lady problems." Guiducci did not fear for his own safety at this point, but rather, was attempting to de-escalate Tyler to calm him down and get him to agree to leave the scene. Tyler did agree to walk the relative short half-mile distance to his house rather than taking his motorcycle, and because Tyler had settled down, Guiducci decided not to arrest him.

---

[3] The following recitation of facts is taken, primarily verbatim, from Defendants' Statement of Undisputed Facts, ECF No. 38, and Plaintiff's Response thereto, ECF No. 43. The events are also captured on surveillance and bystander video that has been provided to the Court.

[4] Plaintiffs take issue with the word "threatening," and Nicole testified that Tyler did not threaten anyone on the night of November 3. Deposition of Nicole Hooks, ECF No. 43, Ex 2. Semantics aside, the video surveillance speaks for itself. Tyler was argumentative, belligerent and behaving in a physically aggressive manner.

[5] Plaintiffs dispute that either of them was intoxicated, averring that Tyler had two beers earlier that night and Nicole had a few drinks starting at dinner. The video speaks for itself. Tyler presented very clearly as someone who was under the influence of alcohol and/or drugs.

In the meantime, as Guiducci spoke to Tyler, Nicole had walked away from the men to stand in the vicinity of Guiducci's vehicle. Tyler took his motorcycle helmet and began to walk away. Shortly thereafter, Stenderup arrived on the scene as well, and Tyler turned around and began walking back toward the officers, yelling and gesturing angrily again, now with his helmet.

Nicole walked to Tyler to join him seemingly in an effort to leave the scene, but as she walked off, Tyler remained behind to continue to yell and gesture towards the officers and Casino security guards.[6] Guiducci and Stenderup then approached Tyler as he continued to yell and gesture at them. Guiducci testified that he told Mr. Hook to "be quiet and walk home," but Mr. Hook continued walking towards the officers, aggressively yelling obscenities including "Fuck RPD."[7] At this point, Guiducci made the decision to place Tyler under arrest for being drunk in public. The officers approached Tyler, who then started walking away.

Based on the facts that Tyler appeared intoxicated, was arguing and not complying with the officers' demands, had been yelling at Nicole, which raised the possibility of a domestic violence incident, and was carrying a motorcycle helmet that could be used as a weapon, Guiducci testified that he made the decision to utilize pepper spray to subdue and arrest Tyler. Guiducci pepper sprayed Tyler and took him down to the ground, while Stenderup pushed Nicole back. Stenderup gave Nicole a lawful order to stay away while Guiducci attempted to control Tyler. Nicole, who was filming the interaction on her cellphone, put her phone up close to Stenderup's face, with the light directly in Stenderup's eyes. Stenderup swiped the phone away, and Nicole responded by striking him in the face.

---

[6] Plaintiffs contend Tyler was only yelling at the officers and not at the security guards. This is immaterial. The point is that Tyler continued his belligerent diatribe despite having been given the chance to walk home.

[7] Again, Plaintiffs quibble with some ancillary facts, such as where exactly Tyler was walking in relation to the road. Plaintiffs do not, however, dispute that officers were giving Tyler orders that he was ignoring.

3

Stenderup immediately took Nicole to the ground by her hair. In the process, Stenderup contends his taser fell to the ground. Stenderup delivered two punches to Nicole in order to retrieve the Taser and gain control of Nicole's hands. At this point, additional officers and security, joined to assist Guiducci and Stenderup because neither Plaintiff was complying with their arrests.

While Nicole was face down being restrained, Stenderup testified that he heard her say "I can't breathe." Upon hearing Mrs. Hook make this statement, Stenderup testified that he reached down to check her breathing and to examine her for any wounds. Stenderup then picked Nicole up by her armpit. Nicole was not steady on her feet, and he hooked his right hand under her arm, onto her shoulder, lifting her arms upward behind her back to control her as he walked her to his patrol car. At this point, Guiducci lifted Tyler off the ground and walked him to a patrol car that had been brought to the scene of the arrest by another officer.

Stenderup proceeded to place Mrs. Hook in the back of his patrol car while she waited to be searched by another officer. While en route to Shasta County Jail, Stenderup testified that he noticed that Nicole was no longer in his view in the rearview mirror. He proceeded to pull over, where he found Mrs. Hook slumped down and looking ready to vomit. Stenderup testified that he heard an officer ask Nicole if she had any medical issues, to which she responded that she had a seizure disorder and had not taken her medication recently. Stenderup testified further that he then took Nicole to Shasta County Jail and turned her over to the sheriff. Guiducci testified that Tyler was then transported to the Shasta County Jail by another officer.

Plaintiffs thereafter initiated this action pursuing claims for: (1) unlawful arrest, excessive force, and the denial of medical care under the United States Constitution; (2) violation of their federal due process rights; (3) Monell liability; and (4) false arrest/false imprisonment/malicious prosecution, battery, and negligence under California law. Defendants have now moved for judgment as to all causes of action.

**STANDARD**

The Federal Rules of Civil Procedure provide for summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  One of the principal purposes of Rule 56 is to dispose of factually unsupported claims or defenses.  Celotex, 477 U.S. at 325.

Rule 56 also allows a court to grant summary judgment on part of a claim or defense, known as partial summary judgment.  See Fed. R. Civ. P. 56(a) ("A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought."); see also Allstate Ins. Co. v. Madan, 889 F. Supp. 374, 378–79 (C.D. Cal. 1995).  The standard that applies to a motion for partial summary judgment is the same as that which applies to a motion for summary judgment.  See Fed. R. Civ. P. 56(a); State of Cal. ex rel. Cal. Dep't of Toxic Substances Control v. Campbell, 138 F.3d 772, 780 (9th Cir. 1998) (applying summary judgment standard to motion for summary adjudication).

In a summary judgment motion, the moving party always bears the initial responsibility of informing the court of the basis for the motion and identifying the portions in the record "which it believes demonstrate the absence of a genuine issue of material fact."  Celotex, 477 U.S. at 323.  If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist.  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986); First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 288–89 (1968).

In attempting to establish the existence or non-existence of a genuine factual dispute, the party must support its assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits[,] or declarations . . . or other materials; or showing that the materials cited do

not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 251–52 (1986); Owens v. Local No. 169, Assoc. of W. Pulp and Paper Workers, 971 F.2d 347, 355 (9th Cir. 1992).  The opposing party must also demonstrate that the dispute about a material fact "is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson, 477 U.S. at 248.  In other words, the judge needs to answer the preliminary question before the evidence is left to the jury of "not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed."  Anderson, 477 U.S. at 251 (quoting Improvement Co. v. Munson, 81 U.S. 442, 448 (1871)) (emphasis in original).  As the Supreme Court explained, "[w]hen the moving party has carried its burden under Rule [56(a)], its opponent must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita, 475 U.S. at 586.  Therefore, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  Id. at 587.

In resolving a summary judgment motion, the evidence of the opposing party is to be believed, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party.  Anderson, 477 U.S. at 255.  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244–45 (E.D. Cal. 1985), aff'd, 810 F.2d 898 (9th Cir. 1987).

**ANALYSIS**

Defendants contend they are entitled to judgment as a matter of law because: (1) officers used lawful force in effectuating Plaintiffs' arrests; (2) the arrests were both supported by probable cause; (3) regardless, the officers were entitled to qualified immunity with regard to the federal claims; (4) Nicole was not denied medical care; (5) officers did not act with a purpose to harm as required to show a due process violation; (6) Plaintiffs cannot establish Monell liability on the part of the City; (7) Plaintiffs cannot show the specific intent required to prove a claim under California's Bane Act; and (8) the state law claims fail for the same reasons as the federal causes of action. The Court concludes that each of Plaintiffs' claims are foreclosed because the undisputed facts before the Court demonstrate that their arrests were supported by probable cause and the force employed in effectuating those arrests was reasonable.[8]

    **A.    Plaintiffs' arrests were constitutional.**

"Probable cause exists where the facts and circumstances within their (the officers') knowledge and of which they had reasonably trustworthy information (are) sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." Brinegar v. United States, 338 U.S. 160, 175-76 (1949) (internal quotation marks and citation omitted). Officers were advised by the casino that they were trying to remove an intoxicated man from the premises. Based on the videos of Tyler's behavior, it is clear to the Court that officers appropriately assessed that he was inebriated. His mannerisms were aggressive and argumentative. Put simply, he looks very drunk throughout the duration of the events. His actual level of intoxication is irrelevant because there is more than enough shown in the videos to support officers' decision to arrest him for being drunk in public.[9]

---

[8] Nicole's claim that she was denied medical care is not derivative of these arguments, but it fails in any event because there is no evidence before the Court to establish that she actually suffered from any medical issue during the aforementioned events or that she was ever denied care.

[9] Plaintiffs' arguments that Tyler was exercising his First Amendment right to free speech while

7

Regarding Nicole, it is undisputed that she ignored orders to back away from the officers as they attempted to subdue Tyler. After she had already been pushed away and ordered to back up, she walked right back up to Stenderup and shined the bright light from her phone into his eyes. When he swatted the phone away, she struck him in the face. It was clearly proper to arrest her for assaulting a police officer. Accordingly, all federal and state causes of action relating to the lawfulness of the arrests fail.

**B.     The force used to detain Plaintiffs was reasonable.**

"Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." Graham v. Connor, 490 U.S. 386, 396 (1989) (internal quotation marks and citations omitted). The inquiry "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id. "The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Id. "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." Id. (internal quotation marks and citation omitted). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Id. at 396-97.

On balance, the force used to effectuate both Tyler's and Nicole's arrests fell within constitutional bounds. Tyler had been behaving belligerently for an extended period of time, was clearly angry and was acting in an aggressive manner. He was still

---

yelling at the officers is beside the point. Tyler was not arrested for his speech, but for being intoxicated in public.

8

holding a motorcycle helmet that he was using to gesture angrily at officers and that he could have used as a weapon if given the chance.  It was well within the bounds of reason to anticipate that Tyler would react poorly to being arrested and to decide to use pepper spray to ensure officers would be able to subdue him.  Even after having been pepper sprayed, Tyler continued to struggle, justifying officers striking him to gain compliance.

For her part, Nicole was taken to the ground by her hair after striking an officer directly in the face.[10]  She too struggled on the ground, and in the melee objects can be seen falling as well.  It does not matter to this Court what those objects are.  What matters is that this was the epitome of a tense, uncertain, rapidly-evolving situation.  Officers now had two suspects on the ground in close proximity to one another, both of whom were struggling against being handcuffed, neither of whom had been searched.  Striking Nicole in the head to attempt to gain control of her hands under such circumstances was reasonable, especially since she had already harmed one officer and was continuing to struggle.  The officers were entitled to proceed under the assumption that she would hurt them again if given the chance.  Nicole was also actively resisting arrest to the point that it took two officers to forcibly extract her hands so that she could be handcuffed.  Once she was handcuffed, an officer knelt on her back and then picked her up by her armpit and walked her with her arms behind her, high in the air as he held her head to direct her movement.  This was also reasonable.  It most certainly was not comfortable, but it was effective in ensuring that an individual who had already assaulted an officer and then actively resisted arrest remained under the officer's control until they both reached the patrol vehicle.

Police officers are not required to be perfect.  They are not required to sacrifice their safety in in order to employ the least amount of force a court might years later determine from the safety of a courthouse guarded by court security officers and the

---

[10] It does not matter whether Nicole acted out of reflex or an intent to harm.  All that matters is she swung at the officer.

United States Marshals Service should have been used instead.  Officers must employ reasonable force, which does not always play out like we think it will from watching dramatizations on the television or at the movies.  In this case, from the objective perspective of a reasonable officer on the scene, the force employed was reasonable.[11]  Defendants are entitled to judgment.

## CONCLUSION

Defendant's Motion for Summary Judgment (ECF No. 35) is GRANTED.  The Clerk of the Court is directed to enter judgment in Defendants' favor and close this case.

IT IS SO ORDERED.

Dated:  September 10, 2024

MORRISON C. ENGLAND, JR
SENIOR UNITED STATES DISTRICT JUDGE

---

[11] The issue of whether Nicole had a right to film the altercation is a red herring.  Stenderup and Guiducci were attempting to arrest Tyler, and Nicole refused to stay out of the way.  Nothing in the record indicates that Stenderup's concern was stopping her from filming as opposed to trying to prevent her from directly interfering with officers' attempts to detain Tyler.  Plaintiffs admit that Nicole was shining the light from her phone directly into Stenderup's eyes as he was involved in a tense, rapidly evolving situation.  See Response No. 34.  While Plaintiffs do not believe Nicole was close enough to become a liability in the middle of that chaos, the video says otherwise.  And clearly, Stenderup was correct to be concerned about Nicole's proximity since she was close enough for him to easily reach her phone and for her to immediately strike him directly in the face.